USDC SCAN INDEX SHEET

















RYC   5/18/99   10:39

3:99-CV-00181   INGLE V. CIRCUIT CITY

*17*

*RPLYOPPM.*

ORIGINAL

FILED

99 MAY 17 PM 3: 52

BY: _____ DEPUTY

1    REX DARRELL BERRY, ESQ. (CSB #110219)
     DAVIS, GRIMM & PAYNE
2    1111 Third Avenue
     Suite 1865
3    Seattle, WA 98101
     Telephone: (206) 447-0182
4    Fax: (206) 622-9927

5    RICHARD A. PAUL, ESQ. (CSB #57976)
     PAUL PLEVIN & SULLIVAN
6    101 W. Broadway, Suite 1330
     San Diego, CA 92101-8214
7    Telephone: (619) 744-3640
     Fax: (619) 615-0700

8

     Attorneys for Defendant
9    CIRCUIT CITY STORES, INC.

10

11              UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14   CATHERINE INGLE,                )
                                      )  CASE NO. 99 CV 0181J JFS
15              Plaintiff,            )
                                      )  **REPLY MEMORANDUM IN SUPPORT**
16        v.                          )  **OF MOTION TO DISMISS FIRST**
                                      )  **AMENDED COMPLAINT**
17   CIRCUIT CITY, a Virginia         )
     corporation; KEITH ANDERSON, an  )  NOTED FOR: May 24, 1999
18   individual; ERIC GIBBS, an       )  TIME:      10:30 a.m.
19   individual; and DOES 1 through 100,) COURTROOM: 12
                                      )
20              Defendants.           )
     _____)

21

22              I.    **INTRODUCTION**

23        The opposition papers filed by Plaintiff Catherine Ingle

24   ("Ingle") tacitly concede that no federal subject matter

25   jurisdiction exists for her lawsuit.  Ingle concedes that she did

26   REPLY MEM. IN SUPPORT
     OF MOTION TO DISMISS
27   FIRST AMENDED COMPLAINT -- 1
     (Case No. 99-CV-0181J-JFS)
28   (TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

not comply with the administrative prerequisites found in Title
VII, 42 U.S.C. § 2000e ("Title VII"), prior to bringing this
lawsuit.  In the absence of a valid federal claim, no
jurisdictional basis exists, and Ingle's lawsuit must be
dismissed.

## II.   FACTS

The following chronology is undisputed:

- September 9, 1996 - Ingle begins work with Circuit City
  Stores, Inc. ("Circuit City") as a Sales Counselor.
  (See Plaintiff's Opposition to Motion to Dismiss First
  Amended Complaint ("Pltf. Opp.") at 1.)

- September 1997 - Ingle transfers to a Circuit City
  store in Escondido, California.  (Id.)

- September 1997-March 1998 - Ingle alleges that she
  suffered sexual harassment.  (Id.)

- March 12, 1998 - Ingle leaves work claiming a "total,
  temporary disability."  (Id.)

- April 17, 1998 - Ingle files an administrative charge
  of discrimination with a California state agency, the
  Department of Fair Employment and Housing ("DFEH").
  (See Declaration of Michael H. Crosby in Opposition to
  Motion to Dismiss First Amended Complaint ("Crosby
  Decl."), Ex. 1, p. 3.)  Ingle's charge alleges a
  violation of California state law only, makes no

reference to Title VII, and does not request the DFEH
to file her charge with the EEOC. (Id.) Ingle
immediately requested a "right to sue" notice from the
DFEH. (Id.)

- April 21, 1998 – The California DFEH issues to Ingle a
  "right to sue" notice. (Crosby Decl., Ex. 2, p. 4.)
  The notice specifically informs Ingle as follows: "If
  you want a federal notice of Right-To-Sue, you must
  visit the U.S. Equal Employment Opportunity Commission
  ("EEOC") to file a complaint within 30 days of receipt
  of this DFEH Notice of Case Closure or within 300 days
  of the alleged discriminatory act, whichever is
  earlier." (Id.) Ingle did not file any charge with
  the EEOC within either timeline.

- January 12, 1999 – Ingle's employment with Circuit City
  was terminated because her leave of absence exceeded
  six months. (Crosby Decl., Ex. 3, p. 6.)

- February 2, 1999 – Ingle filed her original lawsuit in
  this matter in United States District Court. See
  Original Complaint. The original complaint alleged
  state law claims only, and did not contain any claim
  alleging a violation of Title VII. (Id.)

- March 9, 1999 – In response to a Motion to Dismiss
  filed by Circuit City, Ingle filed a First Amended
  Complaint. See First Amended Cplt. Ingle alleged for

REPLY MEM. IN SUPPORT
OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT -- 3
(Case No. 99-CV-0181J-JFS)
{TAC}\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

the first time two causes of action for violation of
Title VII.  (<u>Id</u>.)

- <u>April 21, 1999</u> - Circuit City filed this Motion to
  Dismiss seeking dismissal of Ingle's First Amended
  Complaint because Ingle failed to plead that she had
  exhausted the necessary administrative prerequisites of
  Title VII; i.e., the filing of an administrative charge
  of discrimination with the EEOC, and receipt from the
  EEOC of a "right to sue" notice.  See Motion to
  Dismiss.

- <u>May 5, 1999</u> - Ingle files for the first time an
  administrative charge of discrimination with the EEOC,
  and immediately requests closure of the case and
  issuance of a "right to sue" notice. (Crosby Decl., Ex.
  4, pp. 8-9.)

- <u>May 6, 1999</u> - EEOC issues to Ingle a Title VII "right
  to sue" notice.  (<u>Id</u>., Ex. 4, p. 9.)

### III.   ARGUMENT AND AUTHORITY

**A.   <u>Ingle's Failure To Properly Exhaust The Administrative
Prerequisites Of Title VII Requires Dismissal Of Her
Title VII Claim</u>.**

Ingle's representations to the contrary, her failure to
properly exhaust the administrative prerequisites of Tile VII
requires dismissal of her Title VII claim.  Once the Title VII

REPLY MEM. IN SUPPORT
OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT -- 4
(Case No. 99-CV-0181J-JFS)
(TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

1    claim is dismissed, Ingle's lawsuit will have no federal subject

2    matter jurisdiction, and must be dismissed.

3        Ingle's primary argument is that her April 17, 1998, <u>state</u>

4    <u>law</u> charge of discrimination filed with the California DFEH

5    should satisfy the requirements under <u>federal</u> <u>law</u> that she file

6    an administrative charge of discrimination with the EEOC alleging

7    a violation of Title VII and receive a "right to sue" notice from

8    the EEOC before pursuing a private lawsuit.  Ingle's assumptions

9    and argument simply are wrong.

10       Under certain circumstances, state and federal anti-

11   discrimination agencies may enter into "work sharing" agreements.

12   <u>See</u> 29 C.F.R. § 1601.13.  Thereunder, a claimant may file a

13   charge with one agency alleging violation of <u>both</u> state law and

14   federal law.  (<u>Id</u>.)  When such a charge is filed with a state

15   anti-discrimination agency such as the DFEH, <u>and when a claimant</u>

16   <u>specifically requests</u>, that charge then will be subsequently

17   filed with the EEOC at the end of the deferral period.  <u>See</u> 29

18   C.F.R. § 1601.13(b).  Importantly, as is the case here, if a

19   claimant does <u>not</u> request such dual filing, she must then file a

20   <u>separate</u> EEOC charge in order to invoke the administrative

21

22

23

24

25

26   REPLY MEM. IN SUPPORT
27   OF MOTION TO DISMISS
     FIRST AMENDED COMPLAINT -- 5
28   (Case No. 99-CV-0181J-JFS)
     (TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

1   process of Title VII.  (Id.)  The pertinent part of 29 C.F.R.

2   § 1601.13(b) (omitted by Ingle) states as follows:

3           (2) When a charge is initially presented

4           to a [state] agency but the charging party

5           does not request that the charge be

6           presented to the Commission, the charging

7           party may present the charge to Commission

8           as follows:

9                   *      *      *

10          (ii) If the [state] agency proceedings

11          have terminated, <u>the charge may be timely</u>

12          <u>filed with the Commission within 30 days</u>

13          <u>notice that the [state] agency proceedings</u>

14          <u>have been terminated or within 300 days</u>

15          <u>from the date of the alleged violation,</u>

16          <u>whichever is earlier</u>.[1]

17  29 C.F.R. § 1601.13(b)(2)(ii) (emphasis added).

18      Ingle's argument that her DFEH charge should fulfill the

19  <u>EEOC's</u> requirements is without merit.  No case ever has held that

20  a discrimination plaintiff can satisfy the strict procedural

21  requirements of Title VII by filing an administrative charge with

22  a <u>state</u> agency, alleging a violation of <u>state</u> law only.  Ingle's

---

24      [1] This precise instruction was given to Ingle by the DFEH in

25  its April 21, 1998, Notice of Case Closure, (Crosby Decl., Ex. 2,
    p. 4), and apparently was ignored by Ingle.

26  REPLY MEM. IN SUPPORT
27  OF MOTION TO DISMISS
    FIRST AMENDED COMPLAINT -- 6
28  (Case No. 99-CV-0181J-JFS)
    (TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

reliance on <u>McConnell v. General Telephone Co. of California</u>, 814 F.2d 1311 (9th Cir. 1986), is inapposite, as the court in <u>McConnell</u> clearly was dealing with a "dual filing" scenario not present here.  Each plaintiff in <u>McConnell</u> in fact had <u>received</u> a "right to sue" notice from the EEOC prior to filing suit under the Age Discrimination in Employment Act.  <u>Id</u>. at 1314.  By contrast, Ingle received no such notice prior to filing this lawsuit.  <u>See also</u> <u>Hudson v. Penn. Turnpk. Comm.</u>, 72 FEP Cases 1251, 1261 (E.D. Pa. 1996) (copy attached) (filing charge with EEOC alleging Title VII violation only does not fulfill state law administrative filing prerequisites).

Ingle next argues that some circumstances permit the filing of a lawsuit prior to the actual receipt of a "right to sue" notice from the EEOC.  While this may be true in some cases, such is not the case here.  None of the authorities cited by Ingle supports application of this doctrine to the facts of this case. For example, <u>Rojo v. Kliger</u>, 52 Cal. 3d 65, 276 Cal. Rptr. 130 (1990) is a decision by a California state court on issues of California state law.  As such, <u>Rojo</u> has no application here.[2] Likewise, neither <u>Edwards v. Occidental Chemical Corp.</u>, 892 F.2d

_____

[2]   In any event, <u>Rojo</u> actually supports Circuit City's position.  There, the California Supreme Court found that while a plaintiff alleging only common law claims for damages need not comply with the exhaustion requirements of California's Fair Employment and Housing Act ("FEHA"), "an employee must exhaust the FEHA administrative remedy before bringing suit on a cause of action under the Act where seeking the relief provided therein. . . . "  <u>Id</u>. at 88.

REPLY MEM. IN SUPPORT
OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT -- 7
(Case No. 99-CV-0181J-JFS)
<small>(TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT</small>

1442 (9th Cir. 1990) or <u>Wrighten v. Metropolitan Hospitals</u>, 726

F.2d 1346 (9th Cir. 1984) support Ingle's position.  Both

decisions recognize that, where a plaintiff has filed an

administrative charge with the EEOC, and files a Title VII

lawsuit <u>prior</u> to receipt of a "right to sue" notice from the

EEOC, and no motion to dismiss is made, the subsequent receipt of

the EEOC "right to sue" notice effectively cures the

jurisdictional flaw.  <u>See</u> <u>Edwards</u>, 892 F.2d at 1445, n. 1;

<u>Wrighten</u>, 726 F.2d at 1351.  Neither case remotely suggests that

a plaintiff may file a federal court lawsuit in the complete

absence of having filed a timely charge of discrimination with

the EEOC.

**B.   Ingle's After-The-Fact Filing Of An EEOC Charge Does Not Cure The Jurisdictional Defect.**

Apparently in response to Circuit City's Motion to Dismiss,

Ingle went to the EEOC last week and filed an untimely charge of

discrimination on May 5, 1999.  (Crosby Decl., Ex. 4, p. 8.)

Ingle's actions do not cure the jurisdictional flaw.  First, the

charge is untimely.  Ingle's April 17, 1998, "right to sue"

notice from the DFEH advised her explicitly that if she wished to

pursue a Title VII claim on those factual allegations, she must

file an administrative charge of discrimination with the EEOC

within 30 days of receipt of the DFEH "right to sue" notice, or

300 days of the complained of discrimination, whichever was

earlier.  (Crosby Decl., Ex. 2, p. 4.)  Thus, to be timely, Ingle

REPLY MEM. IN SUPPORT
OF MOTION TO DISMISS
FIRST AMENDED COMPLAINT -- 8
(Case No. 99-CV-0181J-JFS)
(TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

1   would have had to file an administrative charge of discrimination

2   with the EEOC by <u>May 21, 1998</u>.  She failed to do so.

3        Nor can Ingle legitimately contend that her recent untimely

4   EEOC charge saves her Title VII claim as a "continuing

5   violation."  Ingle's untimely EEOC charge alleges that the

6   complained-of discrimination both began and ended on a single

7   day, January 12, 1999, when her employment was terminated.

8   (Crosby Decl., Ex. 4, p. 8.)  As such, the charge alleges no

9   "continuing violation."  <u>See</u> <u>Draper v. Coeur Rochester, Inc.</u>, 147

10  F.3d 1104, 1107 (9th Cir. 1998) (continuing violation must be

11  "founded on a pattern or practice of employer conduct that

12  continued into the relevant period of limitations."); <u>see</u> <u>also</u>

13  <u>Rush v. Scott Speciality Gases, Inc.</u>, 113 F.3d 476, 484 (3rd Cir.

14  1997) (failure to promote claim and failure to train claim are

15  not sufficiently related to qualify as "continuing violation.").

16  Further, Ingle's own description of the facts makes clear that no

17  "continuing violation" theory applies.  She alleges that she was

18  sexually harassed between September 1997 and March 1998.  (Pltf.

19  Opp., at 1-2; Crosby Decl., Ex. 1, p. 3.)  She then confirms that

20  she was off work completely for six months prior to her

21  administrative termination in January 1999.  (Pltf. Opp. at 2;

22  Crosby Decl., Ex. 4-8.)  Ingle's charge does not suggest that any

23  "harassment" continued during her six month absence from

24  employment.  (<u>Id</u>.)  As such, no basis exists to tie her new

25

26  REPLY MEM. IN SUPPORT
27  OF MOTION TO DISMISS
    FIRST AMENDED COMPLAINT -- 9
28  (Case No. 99-CV-0181J-JFS)
    (TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

1  untimely EEOC charge to her past DFEH charge on any "continuing

2  violation" theory.

3  **IV.   CONCLUSION**

4     For the reasons stated herein, Circuit City respectfully

5  requests that this Court dismiss Ingle's First Amended Complaint.

6  The sole jurisdictional basis of Ingle's complaint is federal

7  question jurisdiction based on two fatally flawed Title VII

8  claims.   In the absence of those claims, no federal subject

9  matter jurisdiction exists, and this complaint must be dismissed.

10    DATED this ___14th___ day of May, 1999.

11

12                              DAVIS, GRIMM & PAYNE

13

14                      By: _____

15                              Rex Darrell Berry, CSB #110219
                                Attorneys for Defendant
16                              Circuit City Stores, Inc.

17

18

19

20

21

22

23

24

25

26  REPLY MEM. IN SUPPORT
    OF MOTION TO DISMISS
27  FIRST AMENDED COMPLAINT -- 10
    (Case No. 99-CV-0181J-JFS)
28  (TAC)\CC\INGLE(2072.33)\REPLY-DISMISS.AMDCPLT

| | |
|---|---|

ᴛOWNSHIP

ᴏf sexual ha-
ᴢzano Dep. at
ᴛe Police De-
ᴛ anti-sexual
In 1993, Ser-
ᴋas again the
ᴄeiving a sex-
ᴛ work, *see id.*
ᴏnse, Pettine
ᴏrensic labora-
lysis, *see id.*,
ᴛ identify the
*see id.* The
ᴛa Penta in-
ᴀshoulder of
Carol Shoe-
ᴅep. at 14-15,
ᴏld La Penta
ᴛnappropriate
*Id.* It does
ᴀker made a
ᴛhe incident

ᴇr has failed
ᴄh a pattern
ᴛ the Police
*See Deborah*
(finding no
ᴛ violations
ᴛure to train
despite the
who alleged
ᴛer, sexually
pointed to
ᴇr who im-
ᴛnt). Indeed,
ᴛed of inci-
ᴛ, the Police
ᴏroper and
ᴇes. Accord-
ᴛnenberger's
ᴛ.

ᴏws:

ᴛ of Decem-
ᴛn of defen-
ᴛary judg-
ᴛrespective
ᴡith the ac-
ᴛ it is here-

ᴇnta's mo-
ᴛgment *is*

ᴛownship's
ᴏPolice De-
ᴛary judg-
ᴛounts 1, 2

ᴛ and 6, we
ᴏplemental
ᴛ. §1367(c);

ᴛ this case

---

### HUDSON v. PENNSYLVANIA TURNPIKE COMM.

**U.S. District Court,
Eastern District of Pennsylvania**

THEODORE HUDSON, III v.
PENNSYLVANIA TURNPIKE COM-
MISSION, No. 95-5786, November 14,
1996

#### CIVIL RIGHTS ACT OF 1964

**1. Timeliness ▸108.6913**

Discharged black turnpike toll col-
lector's discriminatory-discharge ac-
tion could be decided solely on basis of
fact that he filed action one day after
90-day period for filing action after
receipt of notice of right to sue ex-
pired.

**2. Race — Discharge ▸108.30259
▸108.73349**

Discharged black turnpike toll col-
lector has not shown that other non-
black employees were treated more fa-
vorably after audit of their
transactions revealed single missing
ticket, where presumption of theft was
raised under turnpike commission's
criteria for theft when premarked
ticket dropped on him by internal re-
view analyst, who had no information
regarding his race at time she discov-
ered suspicious pattern of transactions
in his reports, was traced and found
not to have been processed or account-
ed for by cash overage in his deposits,
his only evidence was of another black
collector who was subject of two ticket
drops prior to being discharged, there
is no evidence that commission dis-
criminated in manner in which it ei-
ther targets or randomly selects em-
ployees for audit, 48 employees have
been discharged for theft since audit
system has been in effect—past 20 of
which were as result of single ticket
drop, union has not arbitrated another
case of discharge when theft criteria
have been present since arbitrator
upheld integrity of auditing system,
and he testified that he had no person-
al knowledge of another collector who
was not fired when criteria were met.

**3. Race — Discharge ▸108.30259
▸108.7335**

Turnpike commission articulated le-
gitimate, non-discriminatory reason
for discharging black toll collector for
theft, as defined in collective bargain-
ing contract, where commission's usu-
al procedures were followed and its
preset criteria for raising presumption
of theft were met during audit, for
which he was targeted after suspicious

pattern was discovered in his transac-
tion reports, that resulted in pre-
marked ticket that internal review an-
alyst dropped on him being
unaccounted for.

**4. Race — Discharge ▸108.30259
▸108.7338**

Black turnpike toll collector has not
raised inference that his discharge for
theft, following audit in which pre-
marked ticket given him was never ac-
counted for, was racially motivated,
since toll collector who allegedly had
made racial epithets did not partici-
pate in audit process, turnpike com-
mission's failure to respond to his ap-
plication several years earlier for
promotion does not support conten-
tion that it intended to discriminate
against him by terminating him, and
his witnesses' explanations as to how
and why ticket could be missing from
toll collector's bag does not show that
theft presumption was unjustified and
termination was racially biased; com-
mission's systems-review division con-
cluded after audit that commission's
preset theft criteria existed with re-
spect to his tour of duty that day, com-
mission then had right under collec-
tive bargaining contract to discharge
him immediately, and its evidence
shows that it consistently terminates
toll collectors regardless of race as soon
as theft criteria are found.

**5. Retaliation ▸108.4511**

No causal link has been demonstrat-
ed between black turnpike toll collec-
tor's discharge, following audit in
which turnpike commission's preset
theft criteria were found to be present,
and incidents over six years earlier
when he was reinstated by arbitrator
after being discharged and black man-
ager then allegedly told him that
"when I fire you, you won't be coming
back"; while mere passage of time may
not be conclusive as to whether these
events were related, inferential leap
cannot be made that manager's al-
leged comment evidences pattern of
antagonism and retaliation, and infer-
ence cannot logically be drawn that
collector's discharge after audit and
finding of theft was in retaliation for
his earlier claims of discrimination.

#### CIVIL RIGHTS ACT OF 1866

**6. Race — Discharge ▸106.0625
▸108.30259**

General allegations of discrimina-
tion by black turnpike toll collector
who was discharged for theft following
audit that uncovered missing ticket
are insufficient to make out claim un-
der 42 U.S.C. §1981, where turnpike

commission followed its audit procedure, which has been in place for over six years, he is one of 48 toll collectors who have been discharged for theft since audit system has been in place, past 20 of these have been discharged after single missing ticket was discovered, toll collector's race is not known to internal review analysts who target collectors for audit, and he has not shown that race played role in random audits also conducted by these analysts or that commission departed from its procedures in auditing and discharging him.

**STATE FEP ACTS**

**7. Exhaustion of remedies ▸106.6035 ▸108.60**

Discharged black turnpike toll collector who filed charge only with EEOC did not exhaust his administrative remedies as required by Pennsylvania Human Rights Act, absent any evidence that EEOC transmitted his charge to Pennsylvania Human Rights Commission (PHRC) for further processing; fact that worksharing agreement exists between EEOC and PHRC does not suggest that charge filed with EEOC will be considered filing with PHRC.

———

George E. Walker, Philadelphia, Pa., for plaintiff.

Linda M. Barone, Carolyn P. Short, Barbara R. Binis, and John E. Quinn (Reed Smith Shaw & McClay), Philadelphia, Pa., for defendant.

*Full Text of Opinion*

THOMAS J. RUETER, Magistrate Judge: — In this case, plaintiff alleges that his former employer terminated him solely because of his race. Plaintiff brought suit against his former employer asserting claims under 42 U.S.C. §2000e-e(17) ("Title VII"), 42 U.S.C. §1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §951-63 (Purdon's Supp. 1996). On September 19, 20 and 24, 1996, this court conducted a non-jury trial in the above-captioned matter. Pursuant to Fed.R.Civ.P. 52, the court makes the following:

**I. FINDINGS OF FACT**

1. Plaintiff, Theodore Hudson, III, is an African-American male.

2. On September 17, 1982, plaintiff filed an application for employment as a toll collector with defendant, the

Pennsylvania Turnpike Commission ("PTC"). Plaintiff's Exhibit 1.

3. Hudson began his employment with PTC as a toll collector at the Valley Forge interchange in October 1982.

4. In 1988, Hudson was terminated from employment at PTC in what he alleged was an illegal firing. In June 1988, pursuant to the grievance procedures of the Collective Bargaining Agreement between PTC and Teamsters Local Union Nos. 77 and 250, the Union in which toll collectors are members, an arbitrator found that Hudson had been improperly terminated from his position as a toll collector. Hudson was subsequently reinstated as a toll collector.

5. In accordance with PTC procedures, the daily responsibilities of toll collectors include: receipt of tickets and payment from patrons, processing of tickets at the time of receipt through a computer, disbursement of change to patrons, bundling of tickets according to the nature of the transaction at the end of the toll collector's tour of duty, collecting the daily cash receipts and bank slip for deposit, and transmittal to Harrisburg of the tickets in a locked ticket bag along with a copy of the bank deposit slip and Exit Toll Collector's Tour of Duty Report form ("33-15 form"). This form reports exceptions or unusual occurrences. Testimony of Hudson, Durbin, Lenard. *See* Defendant's Exhibits 1, 2, 3, 40.

6. The Systems Review Division of PTC routinely conducts audits of toll collectors. The current audit system has been in effect since 1988. The audits may be random or targeted. Julie Lenard, an internal review analyst with PTC, testified that the occurrence of random audits and the subject of targeted audits remain confidential prior to the actual ticket drop.

7. In a random audit, a marked ticket is dropped on a previously undesignated toll collector. The ticket is then traced through the PTC computer system to determine if it was processed properly.

8. In a targeted audit, the audit department reviews the toll collectors' records for possible theft transactions, specifically drops marked tickets on designated toll collectors, and traces the tickets through the PTC computer system to determine if the tickets were processed properly.

9. A toll collector is targeted based upon a suspicion of theft when a pattern of unusual occurrences is detected. A toll collector may also be targeted based upon patron complaints.

10. The internal review analyst who targets a toll collector does not have

HUDSON

information
targeted c
drop, unles
personal kr
toll collecte
targeting t

11. After
a toll collec
targeted dr
formation
drop. This
physical de
tor, the ti
change and
occurred,
rences tha
ing the dro

12. After
dropped in
nal review
ticket obta
tor's ticket
marked tic
all of the t
collector or
premarked
bag, the au
tailed Trar
report of al
by the com
tor, to de
ticket was
in the toll c

13. The
whether t
manually
toll collecte

14. The i
compares t
of the colle
according t
there is a c
that partic
cally, the a
an overage
to or great
marked tic

15. The C
ment betw
Nos. 77 an
that theft
immediate
tor. *See* D
XXV, §2(C

16. Huds
theft polic
24, ¶13.

17. The ti
was challer
when Rude
tor, filed a
Nos. 77 an
the system
Exhibit 37.

18. Since
arbitrated
system.

19. John
Director o

information concerning the race of the targeted collector, prior to the ticket drop, unless the auditor has previous personal knowledge of the race of the toll collector. Race is not a factor in targeting toll collectors.

11. After an auditor drops a ticket on a toll collector in either a random or a targeted drop, the auditor logs the information gathered during the ticket drop. This information includes a physical description of the toll collector, the time of the drop, the interchange and the lane at which the drop occurred, and any unusual occurrences that may have happened during the drop.

12. After a marked ticket has been dropped in a targeted audit, the internal review analyst who dropped the ticket obtains the audited toll collector's ticket bag and searches for the marked ticket in the bag that contains all of the tickets processed by the toll collector on that particular day. If the premarked ticket is not in the ticket bag, the auditor then searches the Detailed Transaction report, which is a report of all the transactions processed by the computer for the audited collector, to determine if the premarked ticket was processed by the computer in the toll collector's booth.

13. The auditor also investigates whether the premarked ticket was manually processed by searching the toll collector's detailed cash listing.

14. The internal review analyst also compares the total daily cash receipts of the collector with the amount due according to the tickets to determine if there is a cash overage or shortage for that particular tour of duty. Specifically, the auditor seeks to determine if an *overage exists in an amount equal to or greater than the amount of the marked ticket.

15. The Collective Bargaining Agreement between Teamsters Local Union Nos. 77 and 250 and PTC indicates that theft constitutes "just cause" for immediate termination of a toll collector. *See* Defendant's Exhibit 5, Art. XXV, §2(C).

16. Hudson was aware of the PTC theft policy. *See* Defendant's Exhibit 24, ¶13.

17. The integrity of the audit system was challenged and arbitrated in 1991 when Rudolph Robinson, a toll collector, filed a grievance with Local Union Nos. 77 and 250. The arbitrator found the system to be sound. Defendant's Exhibit 37.

18. Since 1991, the Union has not arbitrated the integrity of the audit system.

19. John Durbin, present Executive Director of PTC, testified that it is

PTC policy that a presumption of theft on the part of a toll collector arises if (1) a premarked ticket is missing from the toll collector's ticket bag and is not located within the entire PTC system; (2) there is no computer record that the ticket was processed; and (3) there is no cash overage in an amount equal to or greater than the value of the ticket that was dropped. The audited toll collector is then asked to resign or is terminated.

20. Lenard testified that the presumption of theft may arise after a single ticket drop as long as the three theft criteria are met from the circumstances of that drop.

21. Lenard identified a suspicious pattern of regrouping transactions on Hudson's Detailed Transactions reports during June and July of 1994. *See* Defendant's Exhibits 41, 42.

22. On September 20, 1994, the Systems Review Division conducted random and targeted audits of toll collectors at a number of PTC interchanges. Lenard, Thomas Cohick and Thomas Nicholson were the internal review analysts who conducted these audits.

23. As a result of the pattern of unusual occurrences in Hudson's Detailed Transactions report, on September 20, 1994, Lenard dropped two premarked tickets on Hudson at the Valley Forge interchange as part of a targeted audit.

24. On September 20, 1994, the Systems Review Division also targeted for audit two toll collectors at interchange 25A. One white collector and one black collector were targeted as a result of patron complaints.

25. Random tickets were dropped on five other toll collectors, three white collectors at interchange 26 and two black collectors at interchange 27.

26. The number of white and black toll collectors working during the random drops were five white collectors and three black collectors at interchange 26 and four white collectors and three black collectors at interchange 27.

27. On September 20, 1994, at 2:09 p.m. and at 4:07 p.m., Lenard passed through the lane in which Hudson worked at the Valley Forge interchange.

28. During each drop, Lenard gave Hudson a premarked ticket and the correct fare. Lenard gave premarked ticket No. 9305 to Hudson at 4:07 p.m.

29. After the drop, Lenard noted the collector's description, the date, time, interchange, lane number, and amount of the fare on an Auditor's Log Report.

30. Cohick also passed through Hudson's lane at the Valley Forge inter-

change on September 20, 1994, in an attempt to drop premarked tickets on Hudson, but was waved to the tandem booth which was run by Hudson's lane which was run by Beverly Goodman, another toll collector.

31. Lenard obtained Hudson's ticket bag for September 20, 1994 to search for the premarked tickets. Hudson's ticket bag did not contain ticket No. 9305.

32. On October 3, 1994, Lenard checked the Detailed Transaction report for Hudson's tour of duty on September 20, 1994, to determine if there was a transaction record of ticket No. 9305 on that day. Lenard found no transaction record for ticket No. 9305.

33. Lenard manually checked the tickets from Hudson's ticket bag against the tickets listed on the Detailed Transaction report. Every ticket found in Hudson's ticket bag had a corresponding listing on the transaction report; however, there was no indication that ticket No. 9305 had been processed. *See* Defendant's Exhibit 8.

34. A Cash Day Audit Query run on November 2, 1994, for ticket No. 9305 later disclosed that the ticket had never been processed by the system. Defendant's Exhibit 10.

35. Hudson's 33-15 report for September 20, 1994 did not report any notations of equipment breakdown or unusual occurrences. Defendant's Exhibit 31.

36. Lenard also audited Hudson's bank deposit slip to determine if there was an overage of $12.75 in Hudson's bank deposit. Defendant's Exhibit 30.

37. Lenard sent a memorandum to John Durbin on October 4, 1994, to report that ticket No. 9305 was not in Hudson's ticket bag from September 20, 1994, nor did it appear on Hudson's Detailed Transaction report for September 20, 1994.

38. On October 5, 1994, Durbin sent a memorandum to Sam Sadler, the Deputy Executive Director for Fare Collection at PTC, directing that Hudson be immediately removed from the work schedule. Defendant's Exhibit 11.

39. A meeting was scheduled for October 14, 1994, to be held at the Eastern Regional Office ("ERO") of the PTC to discuss Hudson's performance on September 20, 1994. Defendant's Exhibit 12.

40. John Durbin, Anita Chadwick, Rebecca Vinson, Julie Lenard, Glenn Minnich, Hudson, James Demarco and Jock Rowe were present at the October 14, 1994 meeting. Defendant's Exhibit 14, 16.

41. Lenard testified that the purpose of the October 14, 1994 meeting was to inform Hudson of the suspicion of

theft against him and to give Hudson the opportunity to provide an explanation for the suspicion of theft.

42. Lenard identified Hudson at the October 14, 1994 meeting as the collector upon whom she dropped a ticket during the September 20, 1994 audit. Defendant's Exhibit 16.

43. During the October 14, 1994 meeting, Hudson denied any wrongdoing on September 20, 1994 and refused to resign from his position as toll collector. Defendant's Exhibits 14, 15.

44. On October 17, 1994, Durbin recommended that Hudson be discharged immediately from PTC. Defendant's Exhibit 16.

45. Sadler concurred with Durbin's recommendation for termination of Hudson based upon theft. Defendant's Exhibit 17.

46. Hudson was notified by certified letter dated October 19, 1994 that his employment with the PTC was immediately terminated. The letter written by Joseph L. DiRienzo, Director of Human Resources, notifying Hudson of the termination stated that the reason for the termination was "failure to make proper disposition of Pennsylvania Turnpike Commission funds." Defendant's Exhibit 18.

47. Hudson filed a Grievance Report with his Union in connection with the termination, claiming that he was not involved in the theft alleged to have taken place on September 20, 1994. Defendant's Exhibit 19.

48. In accordance with the Collective Bargaining Agreement between PTC and Teamsters Local Union Nos. 77 and 250, Hudson appealed his termination through Jock Rowe, Secretary-Treasurer of the Union, and requested a Third Step Hearing. Defendant's Exhibit 20.

49. A Third Step Hearing was held on November 9, 1994. *See* Defendant's Exhibit 21.

50. Upon review of the procedures followed by the Systems Review Division in the termination of Hudson during the Third Step Hearing, and the testimony presented at the Hearing, Albert C. Peters II, Assistant Counsel for PTC, concluded that Hudson had engaged in theft of PTC funds and denied Hudson's grievance. Defendant's Exhibit 22.

51. Teamsters Local Union No. 77, through its representative Rowe, declined to present the denial of reinstatement for arbitration. Defendant's Exhibit 25.

52. At the Third Step Hearing, Hudson claimed that another off-duty toll collector was running Hudson's lane at the time of the marked ticket drop performed by Lenard on September 20,

1994 at 4[...]
22.

53. Dur[...]
dictates t[...]
sible for [...]
his or her[...]
other tha[...]
may run [...]

54. Acc[...]
Duty Su[...]
1994. Hu[...]
from 1:52[...]
3:04 p.m.[...]
hibit 9.

55. Hu[...]
criminati[...]
ment O[...]
("EEOC")[...]
the basis [...]

56. Hu[...]
letter fro[...]
Defendan[...]
hibit 29.

57. On J[...]
a Notice [...]
with the [...]
tions Cor[...]
dant's E[...]
that he d[...]
alleging [...]
workplace[...]
Hudson s[...]
matic anc[...]
state or [...]
mission."[...]
Count III.

58. Hud[...]
action on[...]
redress fo[...]
criminatic[...]
§2000e-e([...]
§1981, an[...]
Relations[...]
Stat. Ann.[...]
it 24, p. 1[...]

59. In hi[...]
that he w[...]
cause of h[...]
racially m[...]
fendant's [...]

60. Plai[...]
tello, who[...]
tor, used r[...]
tiff on a c[...]
that Bart[...]
gaboo." H[...]
ported thi[...]

61. Plai[...]
was not pr[...]
meeting a[...]
Hearing. I[...]
had nothi[...]
tion decisi[...]

' It appears [...]
charge of dis[...]
7, 1995. See D[...]
of Fact and C[...]
Complaint ar[...]
tend that the[...]

1994 at 4:07 p.m. Defendant's Exhibit 22.

53. *Durbin testified that PTC policy dictates that a toll collector is responsible for his or her cash drawer during his or her tour of duty, and that no one other than the assigned toll collector may run a lane at any given time.*

54. According to Hudson's Tour of Duty Summary for September 20, 1994, Hudson was present in his lane from 1:52 p.m. to 2:28 p.m. and from 3:04 p.m. to 4:56 p.m. Defendant's Exhibit 9.

55. Hudson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination on the basis of race.[1]

56. Hudson received his right to sue letter from the EEOC on June 14, 1995. Defendant's Exhibit 24, at para. 9, Exhibit 29.

57. On June 6, 1995, Hudson received a Notice of Right to File Complaint with the Pennsylvania Human Relations Commission ("PHRC"). Defendant's Exhibit 28. Hudson testified that he did not, however, file a charge alleging race discrimination in the workplace with the PHRC. Instead, Hudson sought to preserve "by automatic and/or other cross-filings with a state or local human relations commission." Defendant's Exhibit 24, Count III, p. 13.

58. Hudson commenced the present action on September 13, 1995, seeking redress for alleged unlawful racial discrimination in violation of 42 U.S.C. §2000e-e(17) ("Title VII"), 42 U.S.C. §1981, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §951-63. Defendant's Exhibit 24, p. 13.

59. In his Complaint, Hudson claims that he was discriminated against because of his race in that his firing was racially motivated and retaliatory. Defendant's Exhibit 24, ¶¶7-8.

60. Plaintiff testified that Art Bartello, who was at the time a toll collector, used racial epithets against plaintiff on a daily basis. Plaintiff alleged that Bartello referred to him as a "jigaboo." Hudson, however, never reported this conduct to management.

61. Plaintiff testified that Bartello was not present at the October 14, 1994 meeting at ERO or at the Third Step Hearing. Plaintiff added that Bartello had nothing to do with the termination decision.

62. Plaintiff testified that there was racial animus on the part of PTC that was pervasive and intended to ridicule plaintiff.

63.Throughout his employment as a toll collector at PTC, Hudson submitted memoranda to management regarding his various concerns about PTC policies and procedures. Plaintiff's Exhibits 6, 7, 10, 14, 15, 16, 17, 18, 18a, 19, 21, 23,.

64. Plaintiff offered the statement of Melvin Shelton, an African-American Senior Manager, as evidence of retaliatory discharge. Plaintiff averred that Shelton said after Hudson's return to PTC in 1988 "when I fire you, you won't be coming back!" Defendant's Exhibit 24, ¶20.

65. Shelton testified that he did not remember making such a statement. *Shelton recalled commenting to Hudson about what Shelton perceived as Hudson's excessive absences.*

66. From December 5, 1989 through July 10, 1996, 48 toll collectors have been terminated from employment at PTC as a result of marked ticket drops. The racial breakdown of those terminated is as follows: 35 white collectors, 12 black collectors, and 1 Indian collector. Defendant's Exhibit 23.

## II. DISCUSSION

### A. Title VII

[1] Title VII of the Civil Rights Act of 1964 provides in relevant part that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. §2000e-2(a)(1).[1] To establish a claim of discrimination based on disparate treatment, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted

---

[1] A claimant in a race discrimination suit under Title VII must bring an action within 90 days of the claimant's receipt of a right-to-sue letter from EEOC. 42 U.S.C. §2000e-5(f)(1); *Mosel v. Hills Dept. Store Inc.*, 789 F.2d 251, 252-53 [40 FEP Cases 1049] (3d Cir. 1986) (holding claim filed 91 days after receipt of right-to-sue letter was time barred). The 90 day time frame has been labeled a statute of limitations, not a jurisdictional requirement. *Clark v. Pennsylvania*, 885 F.Supp. 694, 710 [69 FEP Cases 1379] (E.D. Pa. 1995). Hudson received his right to sue letter on June 14, 1995. He then filed the complaint in the present action on September 13, 1995. The 90 day filing period expired, however, on September 12, 1995. This court could determine the Title VII claim on this ground alone; however, the court declines to do so and will decide this case on the merits.

---

[1] It appears to the court that Hudson filed the charge of discrimination with the EEOC on April 7, 1995. *See* Defendant's Second Proposed Findings of Fact and Conclusions of Law, at 48. Plaintiff's Complaint and Hudson's testimony at trial contend that the charge was filed on June 6, 1995.

in a challenged action, such as dismissal, failure to promote, or failure to hire. *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914 [33 FEP Cases 1091] (3d Cir. 1983), *cert. denied*, 469 U.S. 892 [35 FEP Cases 1688] (1984). In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [5 FEP Cases 965] (1973), and its progeny, the Supreme Court delineated the framework and allocated the burdens of a claim based upon racial discrimination.

First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. Second, if the plaintiff establishes a prima facie case of discrimination, a presumption arises that the defendant discriminated against the plaintiff. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 [25 FEP Cases 113] (1981). At this point, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802-03. The determination that a defendant has met its burden of production does not involve a credibility assessment because the burden of production determination precedes such an assessment. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 [62 FEP Cases 96] (1993). Rather, at this stage, the court is to examine whether any rational person would have to find the existence of facts constituting a prima facie case and whether the defendant has failed to introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action. *Id.* (emphasis omitted). Third, if the employer meets its burden of production, the presumption of discrimination created by plaintiff's prima facie case "drops out of the picture." *Id.* at 511. The plaintiff must then prove that the articulated reason was merely a pretext for discrimination and that discrimination was the real reason for the employment action. *McDonnell Douglas*, 411 U.S. at 804-05. It is important to note, however, that the plaintiff retains, at all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *Burdine*, 450 U.S. at 253.

The Third Circuit subsequently tailored the *McDonnell Douglas* prima facie case formula to a claim based on discriminatory termination from employment. A plaintiff must offer sufficient evidence to create an inference that the employer's actions are based on impermissible reasons. *Jackson v. U.S. Steel Corp.*, 624 F.2d 436, 440 [22

FEP Cases 1818] (3d Cir. 1980). Specifically, the Third Circuit has indicated that the plaintiff must show that he is (1) a member of a racial minority, (2) qualified for the job from which he was discharged, and (3) that others not in the protected class were treated more favorably. *Josey v. Hollingsworth Corp.*, 996 F.2d 632, 638 [62 FEP Cases 221] (3d Cir. 1993). *See also Weldon v. Kraft, Inc.*, 896 F.2d 793 [52 FEP Cases 355] (3d Cir. 1990).

A plaintiff may meet its burden of persuasion with direct or circumstantial evidence. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n.3 [31 FEP Cases 609] (1983) (holding district court erroneously required plaintiff to submit direct evidence of discriminatory intent). As the Third Circuit recently noted:

> The *McDonnell Douglas - Burdine* burden-shifting framework was created because only rarely will a plaintiff have direct evidence of discrimination. Gone are the days (if, indeed, they ever existed) when an employer would admit to firing an employee because she is a woman, over forty years of age, disabled or a member of a certain race or religion. To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that once the plaintiff has shown . . . [the prima facie elements], unlawful discrimination was the most likely reason for the adverse employment action.

*Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 [70 FEP Cases 1288] (3d Cir. 1996) (holding plaintiff failed to establish a prima facie case of pregnancy discrimination because she did not show that her employer knew of her pregnancy at the time it made the adverse employment decision).

### 1. Plaintiff's Prima Facie Case

[2] In the instant case, plaintiff Hudson has failed to establish a prima facie case of discrimination. Hudson is a member of a racial minority and he was qualified for the position from which he was discharged. Plaintiff, however, failed to establish the third prong of the prima facie case, that other employees not in the protected class were treated more favorably.

The Pennsylvania Turnpike Commission developed an audit system to monitor cash receipts and disbursements of toll collectors and to detect improper distributions of funds by toll collectors. After the Systems Review Division conducts an audit, a presumption of theft arises on the part of the toll collector if three criteria are met: (1) a premarked ticket is missing from the toll collector's ticket bag and is not located within the entire PTC system; (2) there is no computer record

that the ticket was processed; and (3) there is no cash overage in an amount equal to or greater than the value of the ticket that was dropped. The race of a toll collector is not known to an auditor prior to an audit, unless the auditor has previous, personal knowledge of the race of that toll collector. Furthermore, PTC and Teamsters Local Union Nos. 77 and 250 established, as part of their Collective Bargaining Agreement, a policy which provides for the immediate termination of employees who engage in theft. *See* Defendant's Exhibit 5, Article XXV §2(C). In accordance with this audit system and the Collective Bargaining Agreement between PTC and Locals No. 77 and 250, a PTC employee found to engage in theft based upon the three audit criteria is immediately terminated, or his resignation is sought.

Plaintiff, Hudson, was targeted for audit on September 20, 1994. The Systems Review Division applied the three criteria test after auditing Hudson. The panel concluded that Hudson engaged in theft and terminated Hudson from his position as a toll collector after Hudson refused to resign. Plaintiff alleges that other toll collectors who were not members of the protected class were treated more favorably than he since they were not terminated after an audit revealed a single missing ticket. Rather these toll collectors were fired only after several tickets were missing from the toll collectors' ticket bags. The only evidence offered by the plaintiff in support of this contention consisted of testimony concerning another collector, Rudolph Robinson, an African-American male, who was the subject of two ticket drops prior to being discharged for theft in 1991 (as opposed to the single ticket drop that resulted in Hudson's termination). In connection with Mr. Robinson's termination, Teamsters Local Union No. 77 challenged the audit procedures. After a Grievance Hearing, an arbitrator upheld the integrity of the system and the Union has not arbitrated another case since, when the three criteria are present in an allegation of theft.

Plaintiff has produced no evidence, other than mere conjecture, that PTC discriminates either in the manner in which it targets employees for audit or in the manner in which it randomly selects employees for audit. From December 5, 1989 to July 10, 1996, forty-eight employees, one of whom was Hudson, were terminated for engaging in theft against PTC. The past twenty toll collectors who were terminated for theft were terminated after a single ticket drop. Plaintiff has not estab-

lished that other toll collectors who were found to have engaged in theft were treated more favorably than Hudson, when Hudson was so accused. Plaintiff himself testified that he had no personal knowledge of another toll collector who was *not* fired after the three criteria were found to raise a presumption of theft. The evidence plaintiff presented does not suffice to establish a prima facie case of disparate treatment on the part of PTC. *See e.g. Flagg v. Control Data*, 806 F.Supp. 1218, 1223 [69 FEP Cases 296] (E.D. Pa. 1992), *aff'd*, 998 F.2d 1002 [72 FEP Cases 1280] (3d Cir. 1993), *cert. denied*, 510 U.S. 1052 [72 FEP Cases 1280] (1994) (stating that plaintiff did not establish a prima facie case because plaintiff did not show that others in the non-protected class were treated more favorably, e.g. "that a white male field technician had his driver's license suspended and was not terminated"); *Riddick-Battle v. Department of Navy*, No. CIV.A.95-7488, 1996 WL 502241, at *3 (E.D. Pa. Aug. 28, 1996) (noting that plaintiff failed to show that other non-minority employees, similarly situated to plaintiff, were treated differently for the same offense since "there was a complete lack of evidence to indicate that other employees who assaulted co-workers were not terminated or received lesser disciplinary sanctions"); *Benson v. Department of Navy*, No. 95-0127, 91-8030, 1996 WL 397474, at *5-6 (E.D. Pa. July 10, 1996) (stating that plaintiffs satisfied the fourth prong of the prima facie case when they demonstrated that others not members of the protected class were treated more favorably by showing that "other White employees who assaulted police officers were given lesser disciplines" than were given to plaintiffs).

### 2. *Defendant's Legitimate Nondiscriminatory Reason for Employment Decision*

[3] Assuming *arguendo* that plaintiff did meet his prima facie burden under the *McDonnell Douglas* framework, defendant PTC still presented a legitimate, nondiscriminatory reason for its termination of Hudson from employment at PTC. As indicated *supra*, "[t]he burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated], or someone else was preferred, for a legitimate, nondiscriminatory reason." *Burdine*, 450 U.S. at 254, 255. Because the ultimate burden of persuasion at all times rests with the plaintiff, the employer need not prove that the proffered reason actually motivated its be-

17

havior. *Fuentes v. Perskie*, 32 F.3d 759, 763 [65 FEP Cases 890] (3d Cir. 1994). The employer meets its burden of production by "introducing evidence, which taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.*

The defendant in the instant case has shown that the plaintiff was terminated from employment at PTC because he engaged in theft, as defined by the Collective Bargaining Agreement between PTC and Teamsters Local Union Nos. 77 and 250. Before concluding that Hudson should be terminated for theft, PTC followed its audit procedures for monitoring the disposition of PTC funds. Theft against PTC is a legitimate, nondiscriminatory reason for discharging Hudson from employment. Because PTC has met its burden of production with respect to a legitimate, nondiscriminatory reason for terminating Hudson, the focus again shifts to the plaintiff to prove that defendant's adverse employment actions were a pretext for discrimination.

### 3. *Pretext for Discrimination*

In the final stage of the *McDonnell Douglas* framework, the plaintiff must prove that the defendant's reason for the adverse employment decision was a pretext for discrimination—that the reason was the real reason. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 [62 FEP Cases 96] (1993). The Supreme Court clarified the significance of plaintiff's burden at the third, and final, stage of the *McDonnell Douglas* framework when it stated that "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of discrimination." *Id.* at 519. The plaintiff will be successful at this stage if he proves "not that the illegitimate factor was the *sole* reason for the decision, but that the illegitimate factor was a *determinative* factor of the employment decision, that is, that but for the protected characteristic" the plaintiff would not have been terminated. *Fuentes*, 32 F.3d at 764 (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 [61 FEP Cases 793] (1993)).

[4] Plaintiff has presented no evidence from which this court can infer that defendant's decision was racially motivated. First, plaintiff has not shown that the defendant's legitimate, nondiscriminatory reason was false. The Systems Review Division concluded that the three theft criteria existed with respect to Hudson on his tour of

duty for September 20, 1994. Under the terms of the Collective Bargaining Agreement, PTC then had the right to immediately terminate Hudson. Second, Hudson has not shown that discrimination was the actual reason for his termination. He has not established that but for his race, Hudson would not have been terminated. On the contrary, defendant has introduced evidence that it consistently terminates toll collectors as soon as the three theft criteria are found, regardless of the race of the toll collector.

Plaintiff's allegations that PTC management acted in a discriminatory manner do not carry his burden of persuasion. Although circumstantial evidence may be used to establish a pretext for discrimination, Hudson's testimony about racial epithets made by Art Bartello, another toll collector, does not evidence a discriminatory intent on the part of PTC in Hudson's termination, since Bartello played no part in the termination. Bartello was a toll collector at the time he made the epithets. Although Bartello was later appointed to an Assistant District Manager ("ADM") position, Bartello did not participate in the audit process. Plaintiff also testified that he was discriminated against because of his race when he applied for an ADM position in 1985, but received no response about his application. The fact that Hudson was not promoted to an ADM position does not support the contention that PTC intended to discriminate against Hudson in terminating him.[1] At trial, Hudson also offered testimony of several witnesses to explain how and why a ticket could be missing from a toll collector's ticket bag, in order to prove that Hudson was wrongfully terminated for theft. Such evidence did not persuade this court, however, that the theft presumption was unjustified and that the termination was *racially* based. Because plaintiff has not proven that defendant's proffered reason for Hudson's termination was false and that Hudson's termination from PTC was in fact a pretext for a racially discriminatory decision, Hudson has not met his burden of persuasion pursuant to the third stage of the *McDonnell Douglas* framework.

---

[1] Likewise, the court finds that the testimony of Barbara H. Davis and Rebecca Vinson, two African-American female PTC employees, that they felt PTC had discriminated against them because of their race does not support a finding that Hudson was terminated because of his race.

### 4. *Retaliatc*

A plainti claim of re demonstra protected took an a against hir link betwe and the ac *CNA Ins. C* Cases 143] *Corp.*, 873 1210] (3d ( U.S. 1023 ( 13 (3d Cir. (1992). Aft prima fac charge, th *Donnell* . framework

Title VI duct agair any pract ployment any empl charge, te pated in a tion, proce tle VII. 4: plaintiff t was prote plaintiff n the under plaint, bu under a g that a vio *CIGNA Coi* Cases 1205 *ner v. Unit* F.2d 203, Cir. 1990).

Hudson by termin firing in 1 not claime because of tion with I rather bec Hudson's constitute Title VII whether H quent con within the of a retali *Jalil*, 873 filing is a ; *Bentsen*, 8t 1995) (sam *Distributio* 701-02 [69 (stating a complainir in genera complain a not consti der Age I ment Act gous to

Case 3:99-cv-00181-J-JFS Document 17 Filed 05/17/99 PageID.125 Page 20 of 24

*14. Under the
Bargaining
d the right to
Hudson. Sec-
wn that dis-
al reason for
not estab-
ace. Hudson
minated. On
has intro-
sistently ter-
soon as the
und, regard-
collector.

that PTC
discrimina-
his burden
circumstan-
i to establish
on, Hudson's
nithets made
toll collector,
minatory in-
in Hudson's
llo played no
artello was a
he made the
llo was later
ant District
on. Bartello
e audit pro-
that he was
cause of his
n ADM posi-
no response
he fact that
d to an ADM
the conten-
to discrimi-
terminating
also offered
nesses to ex-
ket could be
ctor's ticket
Hudson was
r theft. Such
this court,
presumption
the termina-
cause plain-
defendant's
son's termi-
at Hudson's
as in fact a
scriminatory
met his bur-
uant to the
nell Douglas

he testimony of
mson, two Afri-
vees, that they
them because
ndng that Hud-
race

## 4. Retaliatory Discharge

A plaintiff establishes a prima facie claim of retaliation under Title VII by demonstrating that (1) he engaged in protected conduct; (2) his employer took an adverse employment action against him; and (3) there was a causal link between the protected conduct and the adverse action. *Delli Santi v. CNA Ins. Co.*, 88 F.3d 192, 198 [71 FEP Cases 143] (3d Cir. 1996); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 [49 FEP Cases 1210] (3d Cir. 1989), *cert. denied*, 493 U.S. 1023 (1990), *appeal filed*, 968 F.2d 13 (3d Cir.), *cert. denied*, 506 U.S. 903 (1992). After a plaintiff establishes a prima facie claim of retaliatory discharge, the analysis follows the *McDonnell Douglas* burden-shifting framework. *Jalil*, 873 F.2d at 708.

Title VII prohibits retaliatory conduct against employees who "oppose any practice made an unlawful employment practice" by Title VII, and any employee who has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. §2000e-3(a). For a plaintiff to establish that an activity was protected under Title VII, "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that 'he was acting under a good faith, reasonable belief that a violation existed.'" *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 [63 FEP Cases 1205] (3d Cir. 1993) (citing *Sumner v. United States Postal Service*, 899 F.2d 203, 209 [52 FEP Cases 891] (2d Cir. 1990)).

Hudson claims that PTC retaliated by terminating him after an earlier firing in 1988. Hudson, however, has not claimed that he was terminated because of a PHRC filing in connection with his termination in 1988, but rather because he was rehired in 1988. Hudson's 1988 PHRC filing would constitute a protected activity under Title VII. It is unclear, however, whether Hudson's rehiring and subsequent comments by management fall within the ambit of the first element of a retaliatory discharge claim. *See Jalil*, 873 F.2d at 708 (stating an EEOC filing is a protected activity); *Woods v. Bentsen*, 889 F.Supp. 179, 188 (E.D.Pa. 1995) (same). *But see Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 [69 FEP Cases 81] (3d Cir. 1995) (stating a letter to Human Resources complaining about unfair treatment in general that did not specifically complain about age discrimination did not constitute protected conduct under Age Discrimination in Employment Act ("ADEA"), which is analogous to Title VII). Furthermore,

Hudson was rehired in 1988 pursuant to a Union grievance hearing, not as the result of the filing of a PHRC complaint. Hudson did, however, establish the second prong of his prima facie *retaliatory discharge claim*, for Hudson's termination was an adverse employment action on the part of PTC.

[5] Hudson's claim fails with respect to the third element of a retaliatory discharge claim, the causal link between the protected conduct and the employer's adverse action. A plaintiff may demonstrate that the protected conduct and the adverse employment actions are linked by showing that the adverse employment action was close enough in time to the protected activity *to give rise to an inference of retaliation*. *Jalil*, 873 F.2d at 708; *Woods*, 889 F.Supp. at 187. Courts in this circuit have consistently held that the plaintiff has not met its burden of proving a causal link in cases where there is a lengthy gap between a protected activity and an alleged retaliatory act. *See Harley v. McCoach*, 928 F.Supp. 533, 542 [72 FEP Cases 1725] (E.D. Pa. 1996) (holding summary judgment in favor of employer appropriate because the time period of nine months between protected activity and adverse employment action was too great to support an inference of retaliation); *Woods*, 889 F.Supp. at 188-89 (noting that expanse of time between protected activity and adverse employment action did not establish a causal link); *Nixon v. Runyon*, 856 F.Supp. 977, 988 [3 AD Cases 600] (E.D. Pa. 1994) (stating that plaintiff did not prove that an EEOC filing caused subsequent discharge when there was a gap of four months between the protected activity and the termination). The length of time that passed between Hudson's 1988 termination and rehiring and Hudson's 1994 termination detracts from the credibility of Hudson's claim that the two incidents are causally related. Over six years passed between Hudson's 1988 firing and rehiring and Hudson's termination in 1994. Such a temporal gap severely undercuts Hudson's contention that his 1994 termination was in retaliation for activity that took place six years prior to his termination.

The Third Circuit has cautioned, however, that "[t]he mere passage of time is not legally conclusive proof against retaliation." *Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F.2d 892, 894 [64 FEP Cases 250] (3d Cir. 1993). *See Coates v. Dalton*, 927 F.Supp. 169, 170 [72 FEP Cases 1539] (E.D. Pa. 1996) (noting that the presence of a time lapse is not legally conclusive proof

that no retaliation occurred since an employer could avoid liability for retaliation simply by waiting to punish an employee who engaged in protected EEOC activity.) In *Robinson*, the court found that although temporal proximity between the protected activity and the plaintiff's termination was lacking, there was substantial support for the conclusion that the termination had its roots in earlier confrontations over race. *Robinson*, 982 F.2d at 894-95. The court based its decision on the fact that the plaintiff's initial complaints caused the employment relationship to deteriorate and created a pattern of behavior that the employer followed in retaliating against the plaintiff's later efforts at opposing Title VII violations. *Id.* at 895.

Such a factual scenario, however, is not present in the instant case to raise an inference of retaliation on the part of PTC. Hudson stated in his Complaint, "Plaintiff's termination had its genesis and foundation in the fact that he was rehired in 1988 after an earlier illegal firing and, subsequently, management set out by a series of actions to make his work environment exceedingly stressful and difficult." Defendant's Exhibit 24, ¶20. Hudson then cited Melvin Shelton's statement that "when I fire you, you won't be coming back!" as an example of management's intentions. *Id.* Shelton, however, testified that he did not recall making such a statement, but that he may have commented on what Shelton perceived as Hudson's excessive absences. This court cannot make the inferential leap necessary to conclude that Shelton's comment evidences a pattern of antagonism and retaliation. One cannot logically draw the inference that Hudson's firing after an audit *and* finding of theft was in retaliation for Hudson's earlier claims of racial discrimination. Plaintiff's evidence simply does not demonstrate that Hudson was the victim of retaliation.

Even assuming that Hudson did establish a prima facie case of retaliatory discharge, as discussed *supra*, a finding of theft by Hudson was a legitimate, nondiscriminatory reason for terminating Hudson. Furthermore, plaintiff has not persuaded the court that PTC's proffered reason for termination was merely a pretext for discriminating against Hudson and that Hudson's race was the real reason for his termination. Accordingly, Hudson's claim of retaliatory discharge fails as a matter of law.

### B. 42 U.S.C. §1981

To establish a claim under 42 U.S.C.

§1981, a plaintiff must prove discriminatory intent. *Flagg v. Control Data*, 806 F.Supp. 1218, 1223 [69 FEP Cases 296] (E.D. Pa. 1992), *aff'd*, 998 F.2d 1002 [72 FEP Cases 1279] (3d Cir. 1993), *cert. denied*, 510 U.S. 1052 [72 FEP Cases 1280] (1994); *Yelverton v. Lehman*, No. CIV.A.94-6114, 1996 WL 296551, at *5 (E.D. Pa. June 3, 1996). Intent may be demonstrated by a departure from procedural norms, among other relevant facts, but conclusory allegations of generalized racial bias do not suffice to establish discriminatory intent. *Flagg*, 806 F.Supp. at 1223. A plaintiff must also show that the alleged discrimination occurred in connection with an activity listed in the statute including, "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. §1981(b).

[6] Although Hudson's termination is a covered activity under §1981, he has failed to establish discriminatory intent on the part of PTC. Plaintiff's §1981 claim must fail for the same reasons that Hudson's Title VII disparate treatment claim must also fail. Plaintiff's testimonial evidence merely amounts to general allegations of racism. In addition, when it terminated Hudson, PTC followed its audit procedure which has been in place since 1988. Forty-eight toll collectors, including Hudson, have been terminated for theft during the period December 5, 1989 to July 10, 1996. The past twenty toll collectors terminated for theft were terminated after a single ticket drop. The race of a toll collector is not known to the Systems Review Division when it targets collectors for audit and plaintiff did not show that race played a role in random audits. Furthermore, plaintiff has not offered any evidence that PTC departed from procedure in auditing and ultimately terminating Hudson. For these reasons, Hudson has failed to establish discriminatory intent on the part of PTC as is required in a claim based upon §1981.

### C. PHRA

In the Third Count of his Complaint, Hudson prays for relief under the Pennsylvania Human Relations Act ("PHRA"). Defendant's Exhibit 24, at Count III. Under the PHRA, a claimant must file a complaint or charge of discrimination within 180 days of the alleged discriminatory act. 43 Pa. Cons. Stat. Ann. §959(a), (h). If within one year after the filing of a complaint with the Pennsylvania Human Relations Commission ("PHRC") the PHRC dismisses the complaint or

has not entered into a conciliation agreement, the claimant has a right to resort to judicial remedies. 43 Pa. Cons. Stat. Ann. §962(c)(1). A court does not have jurisdiction over a claim under the PHRA, however, if the claimant fails to exhaust such administrative remedies. *Parsons v. City of Philadelphia Coordinating Office of Drug and Alcohol Abuse Programs,* 833 F.Supp. 1108, 1112 [68 FEP Cases 1323] (E.D. Pa. 1993).

[7] Under certain circumstances, a claim filed with the EEOC will satisfy a claimant's administrative requirements under the PHRA. If the EEOC transmits the EEO complaint to the PHRC for further processing, the claimant satisfies the PHRA requirements and the claimant does not need to file a complaint with the PHRC. *Parsons,* 833 F.Supp. at 1112. The fact that a workshare agreement exists between the EEOC and PHRC does not suggest that a charge filed with the EEOC will be considered a filing with the PHRC. *Id.* at 1113.

Hudson does not allege that he filed a claim with the PHRC, but rather that his rights under the PHRA "were preserved by automatic and/or other cross filings with a state or local human relations commission." Defendant's Exhibit 24, at Count III, p. 13. Hudson did file a complaint with the EEOC on April 7, 1995, but never filed a complaint with the PHRC. There is no evidence that the EEOC transmitted Hudson's EEOC complaint to the PHRC for further processing. In the instant case, the EEOC filing does not exhaust his administrative remedies as is required by the PHRA. Therefore, Hudson's PHRA claim fails as a matter of law.

### III. Conclusions of Law

1. Plaintiff has failed to establish by a preponderance of the evidence a prima facie case of race discrimination under Title VII of 42 U.S.C. §2000e-e(17) because he did not show that others not in the protected class were treated more favorably.

2. Assuming arguendo that plaintiff did establish a prima facie case of race discrimination under Title VII, defendant has articulated a legitimate, nondiscriminatory reason for terminating plaintiff from employment at PTC.

3. Plaintiff has not proven that his termination was a pretext for race discrimination.

4. Plaintiff has not met his burden of proving by a preponderance of the evidence a prima facie claim of retaliatory discharge on the basis of race

under Title VII, for he did not establish a causal connection between a protected activity and the adverse action.

5. Plaintiff has not demonstrated that the defendant intentionally discriminated against him on the basis of his race in violation of 42 U.S.C. §1981.

6. Plaintiff's claim under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §§951-63 (Purdon's Supp. 1996) fails since plaintiff did not exhaust his administrative remedies.

The following Judgment Order in favor of the defendants and against the plaintiff on all claims is hereby entered by the court.

### Judgment

AND NOW, this _____ day of November, 1996, in accordance with the court's Memorandum of Decision filed this day, the court hereby enters JUDGMENT in favor of Defendant, Pennsylvania Turnpike Commission and against Plaintiff, Theodore Hudson, III on all claims asserted in his Complaint.

---

### SOLDINGER v. NORTHWEST AIRLINES

**California Court of Appeal, Second District, Division Three**

GERALDINE SOLDINGER, Plaintiff and Appellant v. NORTHWEST AIRLINES, INC., Defendant and Respondent, No. B084660, November 27, 1996

### STATE FEP ACTS

**1. Preemption   ▶106.081   ▶108.1130 ▶108.1146**

Railway Labor Act does not preempt Jewish airline employee's claims under California Fair Employment and Housing Act (FEHA) for religious discrimination and retaliation, despite contention that airline was justified in its actions because it followed bidding procedures mandated by collective-bargaining agreement, since these allegations exist independently of that agreement and are not grounded in it, they must be analyzed according to FEHA's statutory and regulatory standards, and they turn on questions

# ORIGINAL

1   REX DARRELL BERRY, ESQ. (Bar No. 110219
    DAVIS, GRIMM & PAYNE
2   1111 Third Avenue, Suite 1865
3   Seattle, WA  98101
    Telephone:  (206) 447-0182
4   Facsimile:  (206) 622-9927

5
    RICHARD A. PAUL (Bar No. 057976)
6   PAUL PLEVIN & SULLIVAN LLP
    101 West Broadway, suite 1330
7   San Diego, California  92101-8214
    Telephone:  619 237-5200
8   Facsimile:  619 615-0700

9   Attorneys for Petitioner
    CIRCUIT CITY STORES, INC.

10

11                  **UNITED STATES DISTRICT COURT**

12                **SOUTHERN DISTRICT OF CALIFORNIA**

13

14  CIRCUIT CITY STORES, INC., a          )   CASE NO. 99-CV-0181J (JFS)
    Virginia corporation,                 )
15                                        )   **DECLARATION OF PERSONAL**
              Plaintiff,                   )   **SERVICE**
16                                        )
         v.                               )   Person served:
17                                        )
    CATHERINE INGLE,                      )   Michael H. Crosby
18                                        )   2366 Front Street
              Defendant.                   )   San Diego, CA 92101
19                                        )
    _____       )   Date Served:  May 17, 1999
20                                            Time Served:  _13.5 pm_

21

22          I, the undersigned, declare under penalty of perjury that I am over the age of

23  eighteen years and not a party to this action; that I served the above-named person the

24  following documents: **REPLY MEMORANDUM IN SUPPORT OF MOTION TO**

25  **DISMISS FIRST AMENDED COMPLAINT** in the following manner: (check one)

26  1)      ☐      By personally delivering copies to the person served.

27

28

1

2) ☒ By leaving, during usual office hours, copies in the office of the person served with the person who apparently was in charge and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

2

3

3) ☐ By leaving copies at the dwelling house, usual place of abode, or usual place of business of the person served in the presence of a competent member of the household or a person apparently in charge of his office or place of business, at least 18 years of age, who was informed of the general nature of the papers, and thereafter mailing (by first-class mail, postage prepaid) copies to the person served at the place where the copies were left.

4

5

6

7

4) ☐ By placing a copy in a separate envelope, with postage fully prepaid, for each addressee named above and depositing each in the U.S. Mail at San Diego, California, on **May 17, 1999**.

8

9

Executed on May 17, 1999 at San Diego, California.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PAUL PLEVIN
& SULLIVAN LLP

DECLARATION OF PERSONAL SERVICE

-2-

99-CV-0181J (JFS)